IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDMOND GRISHAM,<br><br>    Defendant. | CRIMINAL ACTION NO.<br><br>1:17-cr-208-MHC-CMS |

## FINAL REPORT AND RECOMMENDATION

Defendant Edmond Grisham is accused of committing six commercial armed robberies in late December 2016. [Doc. 1, Indictment]. In connection with those robberies, he is charged in a twelve-count indictment with six counts of Hobbs Act Robbery and six counts of brandishing a firearm during the commission of a violent crime. [Id.].

In the late hours of December 26, 2016, uniformed officers from the DeKalb County Police Department stopped Defendant while he was driving a light-colored Subaru wagon. Through the pending Motion to Suppress Evidence, Defendant challenges the constitutionality of the stop. [Doc. 19]. On March 9, 2018, I held an evidentiary hearing on the motion at which two law enforcement officers testified. [Doc. 38, Transcript("Tr.__")]. For the reasons that follow, I recommend that the Motion to Suppress Evidence [Doc. 19] be denied.

## I.     FACTS

The vehicle stop was conducted at the request of Shane Stanfield, a Lieutenant with the DeKalb County Police Department. Lieutenant Stanfield testified at the evidentiary hearing, along with his colleague, Detective Chasity Cantrell. Both testified that in December 2016, they were investigating a series of commercial robberies in DeKalb County. [Tr. 8, 26-27, 41].

Lieutenant Stanfield and Detective Cantrell each testified that as part of the robbery investigation, they had reviewed video surveillance footage from several of the robberies. [Tr. 10-12, 19-20, 40-42, 44-58]. Based on that footage, they believed that a light-colored (silver, gray, or champagne-colored) Subaru wagon was one of several vehicles used in the robberies; the Subaru had tinted windows, a dent on the right front side, and a sticker with writing located at the top of the back window. [Tr. 11-12, 19, 21-22, 28, 56-57]. The Government introduced still shots from some of the video footage showing the Subaru at various robberies. [Doc. 39-22 (Gov. Ex. 40); Doc. 39-28 (Gov. Ex. 50); Doc. 39-29 (Gov. Ex. 51); Doc. 39-30 (Gov. Ex. 52)]. Detective Cantrell testified that as part of the investigation, she had issued a BOLO ("be on the lookout") notice for the Subaru that was sent to all DeKalb County law enforcement officers. [Tr. 15, 41-42, 58-59].

Based on the video footage and witness statements, the DeKalb County commercial robbery unit put together the following description of the suspect: male, African American, heavyset, roundish face. [Tr. 10, 20-2, 46]. At the hearing, the Government introduced still shots of the robber taken from the video footage. [Doc. 39-21 (Gov. Ex. 38)]. Detective Cantrell testified that the robber wore a mask and used a black semi-automatic handgun with a silver ejection port to commit the robberies. [Tr. 28-29, 46, 63]. Both witnesses testified that descriptions of the suspect and the Subaru were shared with all the members of the commercial robbery unit, and their notes were mounted on a whiteboard for all to see. [Tr. 42, 58, 60].

Lieutenant Stanfield testified that on the night of the stop, he went to the Econo Lodge hotel near Glenwood Road and I-285 after receiving a tip that a suspect in the robberies—a person nicknamed Pac-Man—might be staying there. [Tr. 9, 12-13, 29-30]. Upon arriving at the Econo Lodge, he saw a Subaru wagon backing out of a parking space, and it matched the description of the Subaru they were looking for. [Tr. 11-14, 30]. Lieutenant Stanfield testified that he could not see who was driving and was not able to determine at that time whether the driver matched the description of the suspect. [Tr. 34]. He watched as the Subaru paused in the middle of the parking lot for a minute or two. [Tr. 13-14, 30-31]. The

Subaru then pulled out onto the road, and Lieutenant Stanfield followed. [Tr. 14, 31]. As he drove, Lieutenant Stanfield radioed other officers to let them know that he was following a vehicle believed to have been involved in an armed robbery, and he requested that the Subaru be stopped. [Tr. 13-14].

Lieutenant Stanfield testified that he followed the Subaru for approximately ten minutes in his unmarked police vehicle until uniformed officers arrived, at which point he backed off to give the uniformed officers more room to make the stop. [Tr. 16]. Using multiple marked vehicles, the uniformed officers pulled the Subaru over on Candler Road near Flat Shoals Road. [Id.]. After the Subaru was stopped, uniformed officers removed Defendant and placed him in the back of a patrol car. As Lieutenant Stanfield approached the scene, uniformed officers advised him that they had observed a semi-automatic weapon sitting in the front of the car between the seats in plain view with the hammer pulled back, ready to fire. [Tr. 17]. The Government introduced photographs of the gun in the Subaru. [Doc. 39-3 (Gov. Ex. 4); Doc. 39-4 (Gov. Ex. 5)].

Lieutenant Stanfield testified that after he spoke with the officers about the gun, he went to the Subaru and looked in the window at the handgun. Then he approached the car where Defendant was being detained, looked at him, and determined that Defendant matched the description of the suspect they were

looking for. [Tr. 17, 19-21, 34]. He testified that he then called Detective Cantrell and advised her about the situation. Detective Cantrell arrived on the scene shortly thereafter. [Tr. 18]. Detective Cantrell testified that upon arriving, she also looked at Defendant and concluded that Defendant matched the description of the suspect they were looking for in connection with the robberies. She also noted that the gun was similar to that used in prior robberies. [Tr. 65-66]. Thereafter, law enforcement placed Defendant under arrest.

## II.   DISCUSSION

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. Const. amend. IV. The Supreme Court has established that police officers may conduct warrantless investigatory searches without violating the Fourth Amendment where there is a reasonable suspicion of criminal wrongdoing.[1] See Terry v. Ohio, 392 U.S. 1, 30 (1968). This includes the right to stop a moving vehicle and to conduct investigations of past crimes. See United States v. Hensley, 469 U.S. 221, 226, 229 (1985). To determine whether

---

[1] The Government argues that the stop was based on both probable cause and reasonable suspicion. Because either standard will suffice to establish that the stop was constitutional, I have analyzed the stop using the lower, reasonable suspicion standard applicable to brief investigatory stops.

there was reasonable suspicion to support a stop, courts look at the totality of the circumstances.  See United States v. Arvizu, 534 U.S. 266, 273 (2002).

The Eleventh Circuit has interpreted the Terry reasonable suspicion standard as being "considerably less" than the probable cause standard.  See United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996).  Nevertheless, "the police are required to articulate some minimal, objective justification for the stop."  Id.  To lawfully conduct a brief investigatory stop of a vehicle, law enforcement officers must "be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion."  Id. at 474-75 (quoting Terry, 392 U.S. at 21).[2]  When a person is detained following a traffic stop, the officer's investigation must be reasonably related in scope to the

---

[2] Reasonable suspicion may also be determined by the collective knowledge of the officers involved in the stop.  See Mikell, 102 F.3d at 475.  Defendant does not raise the collective knowledge issue, but I believe it bears comment because the Government did not provide evidence from the officers who actually stopped the Subaru.  To avail itself of the collective knowledge doctrine, the Government must show that the officer who conducted the stop "maintained at least a minimal level of communication during [the] investigation."  United States v. Willis, 759 F.2d 1486, 1494 (1985).  Here, Lieutenant Stanfield used his police radio to inform his colleagues that he was following a vehicle believed to have been involved in an armed robbery and to request that the vehicle be stopped. [Tr. 13-14].  He testified further that he personally observed the uniformed officers conduct the stop approximately ten minutes later. [Tr. 16].  Although the uniformed officers who conducted the stop did not testify, it is reasonable to infer from the evidence that those officers were acting on Lieutenant Stanfield's instructions and with the knowledge that the Subaru was suspected of being involved in an armed robbery.

6

circumstances that justified the stop, and the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop. See United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).

Defendant argues that there was neither probable cause nor reasonable suspicion to stop his vehicle because Lieutenant Stanfield did not know what the driver looked like at the time he asked for assistance with stopping the Subaru. [Doc. 52 at 9]. Defendant contends that the stop was based on mere suspicion. [Id. at 10]. Defendant argues "[t]he fact that a car matching a description of one of the get-away cars was near an area where a suspect may have been residing fails to rise to the level of the requisite reasonable suspicion that the Fourth Amendment requires." [Id. at 10-11]. I disagree.

Considering the totality of the circumstances, it was reasonable for the officers to suspect that the Subaru was the same one that had been involved in one or more of the robberies. Lieutenant Stanfield testified that he had seen the same vehicle during his review of the surveillance videos from one of the robberies, and Detective Cantrell testified that the Subaru was used in several of the robberies and that she had issued a BOLO for it. [Tr. 12, 15, 41-42, 57-59]. The description of the vehicle that law enforcement was looking for was detailed, including not only the make (Subaru) and body style (wagon), but also included details specific to that

7

particular car (light colored, dent on the front right side, tinted windows, a sticker with writing on the back windshield), and the Subaru that Defendant was driving matched that description. [Tr. 11-12, 19, 21-22, 28, 56-57]. Moreover, the Subaru was located in the parking lot of the hotel where law enforcement believed a suspect was staying. [Tr. 9, 12-13]. These objective facts, taken together with rational inferences from these facts, easily add up to reasonable suspicion that the Subaru was involved in the robberies.

Moreover, the temporary detention of Defendant after the stop was reasonable. It was based on the same facts that gave rise to the stop, and it was supported by the officers' reasonable suspicion that Defendant was personally involved in the robberies given that Defendant was driving a vehicle associated with the robberies, that Defendant fit the description of the robber, and that a gun matching the description of one used in the robberies was located in the front of the car. There was no evidence that the detention was unreasonable in duration.

The totality of the circumstances presented to Lieutenant Stanfield provided him with a particularized and objective basis for suspecting criminal activity with respect to the Subaru and with respect to Defendant. Although Defendant points out that the car was not stolen, that there was no evidence of any traffic infraction, and that Defendant did not flee, these facts do not negate the facts noted above

that, taken together, supported the officers' reasonable suspicion of criminal activity. See United States v. Goldenshtein, No. 1:10-cr-323-TCB-RGV, 2011 WL 1321573, at *8 (N.D. Ga. Feb. 22, 2011) ("Though defendants go to great lengths to offer innocent explanations for every individual piece of evidence the government cites in support of reasonable suspicion, the whole of reasonable suspicion may be greater than the sum of the parts because it is the totality of circumstances that must be considered, not each individual fact in isolation.") Because the traffic stop and temporary detention of Defendant were supported by reasonable suspicion, neither violated the Constitution. See United States v. Webster, 314 F. App'x. 226, 228-29 (11th Cir. 2008) (holding that a Terry stop was justified where the defendant's vehicle matched the color of the vehicle announced in a BOLO warning and had writing on the rear window that was similar to that described by witnesses).

### III.   CONCLUSION

For the reasons stated, I **RECOMMEND** that Defendant's Motion to Suppress Evidence [Doc. 19] be **DENIED**.

Defendant also filed a Motion to Suppress Statements challenging the admissibility of incriminating statements he allegedly made after his arrest. [Doc. 48]. The Government has informed the Court that it does not intend to use any of

Defendant's post-arrest statements during its case-in-chief, and the parties agree that the Motion to Suppress Statements is now moot. Accordingly, I **RECOMMEND** that the Motion to Suppress Statements [Doc. 48] be **DENIED AS MOOT**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 5th day of September, 2018.

_____
CATHERINE M. SALINAS
United States Magistrate Judge